## THE IRENE W. ALLEN.
### No. 505.

District Court, D. Maine, S. D.
May 20, 1940.

Thomas H. Walsh, of Boston, Mass., and Percy T. Clarke, of Ellsworth, Me., for plaintiffs.

Nathan W. Thompson, of Portland, Me., for defendants.

PETERS, District Judge.

This is a libel in rem by the owners and crew of the schooner "Mercantile" against the motor vessel "Irene W. Allen"—Lake Tankers Corporation, claimant—to recover damages caused by a collision of the two vessels in the Penobscot River at Bucksport, Maine, on July 8, 1936. The owners of the schooner were the captain, Walter Billings, and his family, some of whom were on board as crew at the time of the collision. They will be referred to as the libellants, the claimant as the respondent.

Each party claimed the other was solely responsible for the collision. I find the facts to be as follows:

The two-masted schooner "Mercantile", 78 feet over all, loaded with pulpwood, Captain Billings on deck, with his twenty-year old son at the wheel, was proceeding up the river with three lower sails set but only drawing slightly, as the vessel was being pushed by a motor-boat fastened behind her stern. The collision occurred shortly after midnight. The weather was clear, with a full moon, wind light from the south, the high tide just turning. The captain was looking out, but was near the stern, standing on the rail where he could see over the deck-load of wood. The schooner had the usual red and green lights only, asserted by those on the "Allen" to be very dim. Captain Billings estimated his speed at about two knots per hour. The conditions on the river were apparently about perfect for navigation at night.

The collision occurred some five hundred feet above the Waldo-Hancock suspension bridge, where the river is about 1,000 feet wide and navigable for its whole width by vessels of the size of these.

The "Allen" was a coastwise motor-vessel, referred to as a tanker, two hundred feet long, coming down the river from Bangor. In the pilot-house were the captain, pilot and mate, with a lookout stationed on the forecastle head. She was steered electrically and very easily handled, especially as she was light. She was in charge of capable and experienced men,

who had taken many trips up and down the river. She was equipped with and using the lights required by law and there was no question about their brilliance. Her speed was eight and a half or nine knots per hour.

Captain Billings and his son handling their schooner were also capable and experienced, and accustomed to the river, having carried pulpwood up and down it for some years.

The schooner had just passed under the bridge when the motor-vessel rounded the point at Fort Knox, where there is almost a right angle turn in the river, about two thousand feet north of the bridge. The motor-vessel was seen and identified by Captain Billings and his son when she began to push out by the point. At that time the schooner was a bit to the right or eastward of the middle of the river, bound up the river for Brewer, although the captain intended to anchor for the rest of the night at the coaldocks at Bucksport. To reach that point his course in the straightest line would take him by the point at Fort Knox where there was plenty of water and which the captain said he intended to pass giving it a good berth.

The usual course of the "Allen", after rounding the point at Fort Knox, on the western side of the river, was to straighten out and head for the space between the center of the bridge, marked by a green light, and the abuttment on the western side of the river. The pilot and officers of the "Allen" on deck all testified that such was the intention that night, and also that the "Allen" took her usual and proper course on the western side of the river after she rounded the point.

This is disputed by Captain Billings and his son, and here is the principal controversy, involving the cause of the accident, it being claimed by those on the schooner that the motor-vessel, instead of following the western shore after passing the point, made a broad turn toward the eastern or Verona side of the river, so that she was one hundred feet nearer the Verona shore than the center of the river, when the schooner, leaving the bridge, was about fifty feet east of the center of the river.

Captain Billings, assuming that the "Allen" was coming down to the bridge on the eastern side of the river, ordered his son at the wheel "to keep his course and speed".

Captain Billings apparently supposed the vessels were to pass starboard to starboard (which would be contrary to the rules of navigation in a narrow channel such as this technically was), and acted on that supposition until he heard one whistle from the "Allen" and saw her swing to the right, whereupon Captain Billings, seeing a collision was imminent, swung his vessel to his left, as he says, to avoid a head-on meeting, and was struck on his starboard bow by the stem of the Allen. Each vessel accuses the other of being on the wrong side of the channel—that is, the river.

Other violations of the navigations rules are charged, but they are not closely enough related to the cause of the collision to be important.

The schooner did not have the required lookout on the forward part of the vessel, and, as a vessel propelled by machinery (and I take her to be in that category at the time), she did not have the required white lights, and it is claimed that the red and green lights were not sufficient, but these facts had little or nothing to do with the collision. The schooner, just clearing the bridge, was seen by the tanker when she rounded the point, and those on board the schooner saw the tanker even before she fully cleared the point.

The evidence does not indicate that the local situation required a so-called "bend signal" by the tanker, nor that, if given, it would have caused any change in the subsequent occurrences. The determining factor in the case is the course the two vessels took after they saw each other. If the "Allen", when opposite the point at Fort Knox, instead of rounding it, proceeded eastward across the middle line of the river and headed down the eastern shore, thus giving Captain Billings the justifiable impression that she would pass him on his starboard side, then the tanker certainly would be at fault in not observing the rules of navigation. But, although strongly impressed by the obvious sincerity of Captain Billings and his son, I cannot see evidence in the case to sustain such a finding of negligence on the part of the navigators of the tanker.

There was no apparent reason for not rounding the point and proceeding down the western shore of the river, as was customary. It was not necessary to give the point a wide berth. It was a clear moonlight night with only one other vessel in sight of the tanker and that on the other side of the river. The pilot navigating the "Allen" not only had long experience on

the river but lived in the immediate vicinity on Verona Island. His statement that "we came down around Fort Knox point, hugged in to the shore as usual and hauled down around the point and kept over to the right hand side and headed down for the bridge to go a little bit to the right of the green light which marks the center of the bridge", was corroborated by the captain, the mate and the lookout.

It undoubtedly seemed to Captain Billings and his son that when the "Allen" first showed her bow clear of the point she was about to continue to the eastern side of the river. They were mistaken in concluding that she was going so far east, off the natural and usual course. Young Billings, a very intelligent and frank witness, after testifying that he saw the "Allen" as she first appeared by the point, gave testimony as follows:

"Q. And as the Allen came around Fort Knox she kept swinging to her own starboard? A. Yes, sir.

"Q. And you thought when she first came around she was going to get over on the Verona shore? A. It appeared that way.

"Q. But, as it turned out, she was swinging all the time to her right? A. Yes, sir."

The point where the vessels came together, as nearly as it can be ascertained, supports the theory of the respondent. It was very close to the western bank of the river, where the tanker should have been if she proceeded as her officers testified she did.

On this point the mate testified that he was on watch in the pilot-house when he sighted the schooner on the Verona side of the river, near the bridge, and so reported to the pilot, who saw the schooner about the same time. The mate testified that the "Allen" came around the bend and straightened out well toward the western shore.

"About that time you could see this vessel cutting across over on to our side of the river, and Captain Abbott told the master to blow one whistle, which meant that both ships would pass port side to. Then he told him to stop the engines and go full speed astern. * * * From my observation we couldn't have got any closer to the western shore with safety. We were very close. Closer than I ever saw it before. (The mate had made seventy similar trips). The schooner by that time had us boxed in and the only thing to do was to back up,

and at the moment of impact the schooner, —she hit us on the port side, just abaft of our stem, and they fell together easily and the schooner laid up against our port side. To me, the headway of our vessel seemed to be practically off at the moment of impact."

The testimony of the mate was corroborated by all the other persons on deck. This and the other testimony clearly shows that the collision occurred well in toward the western side of the river, close to shore.

There is no sufficient evidence to justify the position of the schooner on the western side of the river. Her captain was steering to clear the point at Fort Knox, and he testified that he never changed his course until about the moment of the collision. His course was constantly bringing him nearer the western side of the river, and it may well be that he did not realize that he was getting so close.

At any rate, there is not sufficient evidence to sustain the claim of negligence in the navigation of the tanker, and judgment must be given for the respondent, the claimant, with costs.